**ON REHEARING EN BANC**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 17-2449**

———————

LARRY ALBERT HURLBURT,

  Plaintiff - Appellant,

v.

JULIET J. BLACK,

  Defendant - Appellee,

and

JOSEPH A. BLEDSOE, III,

  Trustee.

------------------------------

NATIONAL ASSOCIATION OF CONSUMER BANKRUPTCY ATTORNEYS;
NATIONAL CONSUMER BANKRUPTCY RIGHTS CENTER,

  Amici Supporting Appellant.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at
Wilmington.  Louise Flanagan, District Judge.  (7:17-cv-00169-FL)

———————

Argued:  March 20, 2019                                    Decided:  May 24, 2019

———————

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

————————

Reversed and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judges Niemeyer, Motz, King, Agee, Diaz, Floyd, Harris, Richardson, and Quattlebaum joined.  Judge Wilkinson wrote a dissenting opinion, in which Judges Keenan and Thacker joined.

————————

Richard Preston Cook, RICHARD P. COOK, PLLC, Wilmington, North Carolina, for Appellant.   James O. Carter, CARTER & CARTER, P.A., Wilmington, North Carolina, for Appellee.

————————

WYNN, Circuit Judge:

In this bankruptcy case, we are asked to overrule a twenty-two-year-old decision of this Court holding that Chapter 13 debtors may not bifurcate a narrow subset of undersecured home mortgage loans into separate secured and unsecured claims and "cram down" the unsecured portion of such loans. *See Witt v. United Cos. Lending Corp.* (*In re Witt*), 113 F.3d 508 (4th Cir. 1997). As explained further below, we now align our circuit with every other court that has considered this issue to hold that the plain text of 11 U.S.C. § 1322(c)(2) authorizes modification of such claims, not just the payment schedule for such claims, including through bifurcation and cram down. *See, e.g.*, *Am. Gen. Fin., Inc. v. Paschen* (*In re Paschen*), 296 F.3d 1203, 1209 (11th Cir. 2002); *First Union Mortg. Corp. v. Eubanks* (*In re Eubanks*), 219 B.R. 468, 471–73 (B.A.P. 6th Cir. 1998). Accordingly, we overrule our decision in *Witt*.

I.

The facts material to this appeal are not in dispute. In May 2004, debtor Larry Albert Hurlburt purchased real property located at 130 South Navassa Road, Leland, North Carolina (the "Property"), from Juliet J. Black for $136,000. Hurlburt paid Black $5,000 in cash at closing. Black financed the remaining $131,000 of the purchase price through a promissory note executed by Hurlburt in Black's favor, which note was secured by a purchase-money deed of trust naming Black as beneficiary. Under the mortgage agreement between Hurlburt and Black, the $131,000 principal accrued interest at 6% per annum, payable over 119 months in installments of $785.41, with a balloon payment of all remaining principal and accrued interest due on May 26, 2014. In the event of default,

3

interest on the balance would begin to accrue at a rate of 8% per annum.  Hurlburt used

the property as his primary residence from the purchase date until the present day.

    Hurlburt failed to pay the balance owed upon maturation of the loan.  On January

29, 2016, Black initiated a foreclosure action in Brunswick County, North Carolina,

claiming Hurlburt owed her approximately $136,000 under the mortgage.  On April 13,

2016, Hurlburt filed a petition for relief under Chapter 13 of the Bankruptcy Code in the

Bankruptcy Court for the Eastern District of North Carolina, which petition stayed

Black's foreclosure action.  In his petition, Hurlburt valued the Property at $40,000.  That

same day, Hurlburt brought an adversary proceeding against Black seeking to quiet title

in the Property.  On June 13, 2016, Black filed a proof of claim totaling $131,000,

comprising a $40,000 secured claim and a $91,000 unsecured claim.  The next day, Black

filed an amended proof of claim totaling $180,971.72[1] but declined to identify the

amount of the claim that was secured or unsecured as she "[did] not know the value of

the collateral."  J.A. 88.  Hurlburt filed an objection to Black's proof of claim.

    On June 24, 2016, Hurlburt filed an amended complaint in the adversary

proceeding seeking to acquire quiet title or avoid the deed of trust, while maintaining his

statutory objection to Black's claim.  Approximately six months later, the bankruptcy

court granted partial summary judgment in favor of Black, finding the deed of trust was

---

[1] According to Black, her earlier accounting of Hurlburt's indebtedness was
incorrect due to a miscalculation.  This larger figure reflects a compounding interest rate
and amortization of the loan.

4

valid.  *See Hurlburt v. Black* (*In re Hurlburt*), No. 16-00031-5-SWH-AP, 2016 WL 7076980, at *3 (Bankr. E.D.N.C. Dec. 5, 2016).

In February 2017, following the bankruptcy court's decision, Hurlburt filed a proposed Chapter 13 repayment plan, seeking to bifurcate Black's claim into secured and unsecured components.  Under the proposed plan, Black would hold a fully secured claim for $41,132.19, which amount Hurlburt calculated by subtracting a senior Brunswick County tax lien totaling $5,867.81 from the Property's recently appraised value of $47,000.[2]  The plan proposed treating the remainder of Black's claim as unsecured, with Black receiving no payment for that portion of her claim.  On February 23, 2017, Black filed an objection to the amended plan contending that *Witt* barred the plan's proposed modification and bifurcation of her claim and asserting that she was entitled to a secured claim in the full amount due under the mortgage agreement, plus interest.

The parties filed cross motions for summary judgment.  In an opinion filed June 7, 2017, the bankruptcy court first held that Hurlburt's plan would "modify" Black's rights under the note and deed of trust.  In reaching that conclusion, the bankruptcy court first noted that "whereas the note itself requires repayment of $131,000 at 6 percent, the proposed plan would require only repayment of $41,132.19 at 4.5 percent."  *Hurlburt v. Black* (*In re Hurlburt*), 572 B.R. 160, 169 (Bankr. E.D.N.C. 2017).  The plan's proposed changes to the loan principal and interest rate also had the effect of modifying "what

---

[2] Hurlburt represents that an appraiser Black hired valued the Property at $66,000. Appellant's Br. at 7.

constitutes a default under the note," the court explained. *Id.* Having found that Hurlburt's proposed plan modified Black's rights under the note and deed of trust, the bankruptcy court further held that the plan violated 11 U.S.C. § 1322 because, under *Witt*, that provision barred modifying claims secured by a security interest on a debtor's principal residence, like Black's, into secured and unsecured components. *See id.* at 170–71.

The district court affirmed the reasoning and judgment of the bankruptcy court in an opinion and order entered December 19, 2017. *Hurlburt v. Black* (*In re Hurlburt*), No. 7:17-CV-169-FL (E.D.N.C. Dec. 19, 2017). Two days later, Hurlburt filed a timely Notice of Appeal. A Fourth Circuit panel affirmed the district court's order in an unpublished, per curiam opinion issued on August 8, 2018. *Hurlburt v. Black* (*In re Hurlburt*), 733 Fed. App'x 721 (4th Cir. 2018) (unpublished) (per curiam). On January 8, 2019, this Court granted Hurlburt's request for a rehearing en banc, thereby vacating the panel opinion. *Hurlburt v. Black* (*In re Hurlburt*), 747 Fed. App'x 168 (4th Cir. 2019) (mem.).

## II.

Hurlburt's appeal requires that we construe several provisions in the Bankruptcy Code. When construing a statute, we "first and foremost strive to implement congressional intent by examining the plain language." *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 434 (4th Cir. 2012) (citation omitted). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) (citation omitted). In

6

interpreting the plain language of the statute, we also look to "the specific context in which the language is used, and the broader context of the statute as a whole." *Minor*, 669 F.3d at 434–35. We review de novo questions of statutory construction. *In re Sunterra Corp.*, 361 F.3d 257, 263 (4th Cir. 2004).

## A.

Congress enacted the 1978 Bankruptcy Reform Act with the overarching goal of providing debtors with a "fresh start." H.R. Rep. No. 95-595, at 118 (1978). Among other changes, Congress significantly revamped Chapter 13 to better "facilitate adjustments of the debts of individuals with regular income through flexible repayment plans funded primarily from future income." 8 Collier on Bankr. (MB) ¶ 1322.01 (2018). To that end, a debtor seeking relief under Chapter 13 may file with the bankruptcy court a proposed plan for repaying claims, like Black's, asserted against the debtor. *See Assocs. Comm. Corp. v. Rash*, 520 U.S. 953, 956 (1997). Subject to confirmation by the court, that plan may "modif[y] the rights of secured and unsecured creditors." *Tidewater Fin. Co. v. Kenney*, 531 F.3d 312, 316 (4th Cir. 2008).

Section 1325 of the Bankruptcy Code sets forth the criteria a debtor's proposed repayment plan must meet for a bankruptcy court to confirm the plan. Of particular relevance, Section 1325(a)(5) provides that a court can confirm a plan's proposed treatment of a secured claim if one of three conditions is satisfied: (1) "[t]he secured creditor accepts the plan," (2) "the debtor surrenders the property securing the claim to the creditor," or, as Hurlburt seeks to do here, (3) "the debtor invokes the so-called 'cram down' power." *Rash*, 520 U.S. at 956–57. Under the cram down option, which is set

7

forth in Section 1325(a)(5)(B), "the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, . . . and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the *allowed secured claim*. . . ." *Id.* at 957 (emphasis added); *see also* 11 U.S.C. § 1325(a)(5)(B).

Section 506(a)(1), which governs the value of the allowed secured claim, provides, in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

*Id.* § 506(a)(1).

In other words, Section 506(a)(1) "provides that a claim is secured only to the extent of the value of the property on which the lien is fixed," whereas "the remainder of that claim is considered unsecured." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239 (1989). Accordingly, when an allowed claim is undersecured—when the claimed amount exceeds the value of the property securing the claim—"Section 506(a)(1) requires the bifurcation of the claim into two components: a secured claim for the value of the collateral, and an unsecured claim for the balance." *In re Price*, 562 F.3d 618, 623 (4th Cir. 2009); *see also In re Young*, 199 B.R. 643, 649 (Bankr. E.D. Tenn. 1996) ("Section 506(a) simply governs the allowance process for the secured status of a claim by supplying the method or formula for valuation, the result of which is bifurcation or separation of the secured claim into its secured and unsecured components."). Once

8

Section 506(a)(1) bifurcates an allowed claim into secured and unsecured components, Section 1325(a)(5)(B) may then be used to cram down the bifurcated claim to its secured amount, effectively "stripping the lien from the portion of the claim that exceeds that value." *In re Young*, 199 B.R. at 648.

The Bankruptcy Code, however, does not permit bifurcation and cram down of all undersecured claims. In particular, Section 1322(b)(2) generally prohibits Chapter 13 discharge plans from "modify[ing] the rights of holders of secured claims . . . *secured only by a security interest in real property that is the debtor's principal residence*." 11 U.S.C. § 1322(b)(2) (emphasis added). In *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993), the Supreme Court held that that, for purposes of Section 1322(b)(2), a creditor's "rights" are those "reflected in the relevant mortgage instruments" and enforceable under state law, *id.* at 329–30. Because the rights reflected in mortgage instruments include the right "to repayment of the principal . . . over a fixed term at specified . . . rates of interest," Section 1322(b)(2) "prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence." *Id.* at 325–26, 329.

The bankruptcy court and the district court held—and we agree—that Hurlburt's proposed Chapter 13 "modified" Black's "rights" under the promissory note and deed of trust. Among other modifications, the proposed plan reduced the principal due on the loan and reduced the interest rate at which Hurlburt must repay that principal, and thereby constrained the circumstances in which Black can exercise her right to foreclose on the property. *See In re Hurlburt*, 572 B.R. at 169–70; *see also Nobelman*, 508 U.S. at

9

329 (recognizing that a creditor's rights under mortgage instruments may include, without limitation: the right to repayment of the principal at a specified interest rate, the right to retain the lien until the debt is paid off, and the right to proceed against the debtor's property via foreclosure and public sale); *Anderson v. Hancock*, 820 F.3d 670, 675 (4th Cir. 2016) (holding that a debtor's Chapter 13 proposal to reinstate a 5% pre-default interest rate in lieu of a 7% interest rate that was triggered by default ran afoul of § 1322(b)(2)'s anti-modification provision); *Litton v. Wachovia Bank* (*In re Litton*), 330 F.3d 636, 643–44 (4th Cir. 2003) (holding that Section "1322(b)(2) prohibits modifications that would alter at least one fundamental aspect of a claim," including "lowering monthly payments, converting a variable interest rate to a fixed interest rate, . . . extending the repayment term of a note, . . . [altering] the nature and rate of interest, and [changing] the maturity features of the loan").[3]

Because the proposed plan modified Black's rights under the loan documents, the sole issue before this Court is whether Black's claim falls into the narrow exception to Section 1322(b)(2) set forth in Section 1322(c)(2), which provides:

> Notwithstanding subsection (b)(2) and applicable nonbankruptcy law . . . in a case in which the last payment on the original payment schedule for a

---

[3] That North Carolina has an anti-deficiency statute does not change this conclusion. *See* N.C. Gen. Stat. § 45-21.38 (no personal liability on seller-financed mortgages). Under that law, Hurlburt is not personally liable on the debt. But the absence of personal liability does not alter Black's right under North Carolina law to demand full payment of the principal *or else* foreclose on the property. Black bargained for the right to be repaid the principal amount of $131,000, not the value of the underlying property. That is her right as reflected in the note; and that, therefore, is the right that Section 1322(b)(2) protects, if it applies.

10

> claim secured only by a security interest in real property that is the debtor's
> principal residence is due before the date on which the final payment under
> the plan is due, the plan may provide for the payment of the claim as
> modified pursuant to section 1325(a)(5) of this title.

11 U.S.C. § 1322(c)(2). The exception set forth in Section 1322(c)(2), which Congress enacted in 1994, potentially applies to Black's claim because it (a) is secured only by a lien on real property that is Hurlburt's principal residence, and (b) derives from a loan that matured prior to the final payment due under the Chapter 13 plan. Because Hurlburt seeks to modify Black's claim into secured and unsecured components and cram down the unsecured portion, the key question we must resolve is whether the phrase "payment of the claim as modified" authorizes modification of "claim[s]"—including modification of the loan principal through bifurcation and cram down—or only modification of "payment of . . . claim[s]"—by, for example, permitting debtors to repay the outstanding part of a debt over the life of a repayment plan, rather than in accordance with the payment schedule set forth in the mortgage instruments.

   *Witt* concluded that the meaning of that phrase is ambiguous because "[i]t cannot be determined, merely from the statute's text, whether the words 'as modified' should apply to 'payment' or to 'claim.'" 113 F.3d at 511. In finding ambiguity, *Witt* first recognized that "under the 'rule of the last antecedent,' a phrase"—in this case "as modified"—generally "should be read to modify its immediate antecedent"—in this case "claim"—and therefore that interpreting Section 1322(c)(2) as permitting modification of claims was "'quite sensible as a matter of grammar.'" *Id.* (quoting *Nobelman*, 508 U.S. at 330). Nevertheless, *Witt* held that that reading "is not compelled" because "the term

'claim' is part of the phrase 'of the claim,' which modifies 'payment.'   It is quite plausible as a matter of common sense, we believe, that the phrase 'as modified' also modifies 'payment' and not 'claim.'"   *Id.*   In light of this purported ambiguity, *Witt* looked to Section 1322(c)(2)'s legislative history and determined that Congress intended "that only payment may be modified."   *Id.* at 512.

Emphasizing that other aspects of Section 1322(c)(2)—not highlighted in *Witt*—indicate that Congress intended for the exception to permit modification of "claims," not just "payment[s]," other courts universally have criticized *Witt*'s finding of ambiguity and attendant reliance on the statute's legislative history.   *See, e.g.*, *In re Paschen*, 296 F.3d at 1209; *In re Eubanks*, 219 B.R. at 471–73; *In re Tekavec*, 476 B.R. 555, 556, n. 2 (Bankr. E.D. Wis. 2012); *Geller v. Grijalva* (*In re Grijalva*), No. 4:11-bk-25386-EWH, 2012 WL 1110291, at *3–4 (Bankr. D. Ariz. Apr. 2, 2012); *In re Reeves*, 221 B.R. 756, 760 (Bankr. C.D. Ill. 1998); *In re Mattson*, 210 B.R. 157, 158–59 (Bankr. D. Minn. 1997). Commentators have reached the same conclusion—the plain language of Section 1322(c)(2) authorizes Chapter 13 plans to modify claims, not just payment schedules. *See* Nat'l Bankr. Rev. Comm'n, Report of the National Bankruptcy Review Commission 237 (1997) ("[S]ection 1322(c)(2) authorizes a stripdown of an undersecured residential mortgage if final payment would become due during the course of the Chapter 13 plan."); 8 Collier on Bankr. (MB) ¶ 1322.17 (2018) (opining that "the plain language of [§ 1322(c)(2)] permits the modification of a claim on [a qualifying] home mortgage through the bifurcation of that claim into secured and unsecured components, with the unsecured component crammed down pursuant to section 1325(a)(5)," and characterizing *Witt* as a

12

"strained reading of the language" that runs "contrary to accepted canons of statutory construction, as well as the great weight of authority, and inconsistent with other language in the subsection that specifically referred to section 1325(a)(5)").

Although we do not lightly overrule our precedent, we agree with these courts and commentators that "the specific context in which the language is used, and the broader context of the statute as a whole," *Minor*, 669 F.3d at 434–35, establishes that Section 1322(c)(2) is best read to authorize modification of "claim[s]," not just "payment[s]," and therefore that a Chapter 13 plan may bifurcate a claim based on an undersecured homestead mortgage, the last payment for which is due prior to a debtor's final payment under a repayment plan, into secured and unsecured components and cram down the unsecured component.

In reaching this conclusion, we first emphasize—as *Witt* acknowledged, 113 F.3d at 511—that the phrase "payment of the claim as modified" is most naturally read as permitting the modification of claims, not payments, *cf. In re Paschen*, 296 F.3d at 1208 (characterizing "[t]he *Witt* court's view that the phrase 'as modified' modifies 'payment,' rather than 'claim'" as "grammatically strained"). To be sure, courts are not bound to adopt the most natural reading of statutory language. Nonetheless, when, as here, the most natural reading of statutory language supports a particular construction of that language, courts should be wary of adopting an alternative construction.

The dissenting opinion maintains that Section 1322(c)(2) is most naturally read as allowing modification of only payments, not claims, because the provision uses the term "payment" "four times," whereas it uses the term "claim" just once. *Post* at 30. But we

13

do not interpret a statute's meaning simply by tallying up the number of uses of one term and then comparing that figure to the number of times Congress uses other terms.  And all but one of Congress's four references to "payment" in Section 1322(c)(2) are used to define the class of homestead mortgage claims excluded from Section 1322(b)(2)'s reach—those that mature before the final payment due on a repayment plan—and do not deal with the type of modifications permissible under Section 1322(c)(2)—the question this Court must resolve.

Second, we find it significant that Section 1322(c)(2) includes the prefatory phrase "[n]otwithstanding subsection (b)(2)," which indicates Congress intended for Section 1322(c)(2) to be an exception to or limitation on Section 1322(b)(2)'s anti-modification provision.  Put differently, "[t]he prefatory phrase '[n]otwithstanding subsection (b)(2)' is . . . a plain statement that subsection (b)(2)'s prohibition on the modification of loans secured only by an interest in a debtor's primary residence does not have *any* application to the class of claims that fall under § 1322(c)(2)."  *In re Paschen*, 296 F.3d at 1207 (emphasis added); *see also In re Eubanks*, 219 B.R. at 470 ("The introductory phrase, '[n]otwithstanding subsection (b)(2),' clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." (citation and quotations omitted)).  Notably, the prefatory language Congress used in Section 1322(b)—which identifies its provisions as "[s]ubject to subsections (a) *and (c)* of this section," 11 U.S.C. § 1322(b)(2) (emphasis added)—points to the same conclusion: that "Congress abrogated the protection of home mortgages from

14

modification in Chapter 13 cases to the extent, and with respect to, the real estate secured claims described in new § 1322(c)(2)," *In re Eubanks*, 219 B.R. at 471.

Importantly, Section 1322(b)(2)—the provision to which Congress expressly made Section 1322(c)(2) an exception—deals with the "modif[ication of] the *rights* of holders of secured *claims*."  11 U.S.C. § 1322(b)(2) (emphases added).  Recall that *Nobelman* construed the meaning of the term "rights" to encompass *all* interests of the mortgagee "reflected in the relevant mortgage instruments" and enforceable under state law—including "the right to repayment of the principal"—not just those rights that pertain to the *payment* of claims.  508 U.S. at 329–30.  Because Section 1322(c)(2) is an express exception to a statute dealing with the full panoply of contractual rights tied to a claim—not just the rights pertaining to payment—Section 1322(c)(2) is reasonably construed as dealing with the modification of claims in their entirety, not just the modification of payments.

Third—and most significantly—Section 1322(c)(2) provides that a Chapter 13 plan "may provide for the payment of the claim as modified *pursuant to section 1325(a)(5) of this title*." 11 U.S.C. § 1322(c)(2) (emphasis added).  As explained above*,* the "very essence of a [Section] 1325(a)(5) modification is the write down or 'cramdown' of a secured *claim* to the value of the collateral securing the debt." *In re Young*, 199 B.R. at 647–48 (emphasis added).  By referencing a provision dealing with the modification of claims—and with the modification of claims by cramming down the unsecured component of an undersecured secured claim, in particular—as the source of authority for modification, Congress further indicated that it intended for Section 1322(c)(2) to

15

authorize the modification of claims—not just payments—including by bifurcating covered claims into secured and unsecured components and cramming down the unsecured component. *See In re Eubanks*, 219 B.R. at 472–73 ("The cross reference to § 1325(a)(5) in § 1322(c)(2) is an unequivocal statement of congressional intent that Chapter 13 debtors are empowered by § 1322(c)(2) to bifurcate the special real estate secured claims that this new section excepts from the modification protection in § 1322(b)(2)."). Notably, *Witt* nowhere addressed the import of Section 1322(c)(2)'s reference to a claim-modification, as opposed to a payment-modification, provision.

The dissenting opinion maintains that Section 1325(a)(5)(B) deals not with modification of secured claims through bifurcation and cram down, but instead is a "procedural" provision that deals with "payment timing and scheduling." *Post* at 30–31. The dissent errs in characterizing Section 1325(a)(5)(B) as a "procedural" provision.

On the contrary, Section 1325(a)(5)(B) sets forth the *substantive* criteria a debtor's proposed plan must satisfy in order to be confirmed, including that any objecting creditor holding a secured claim—like Black—receive a distribution "under the plan on account of such claim [that] is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). Whereas Section 506(a)(1) does indeed provide for *bifurcation* of undersecured claims, it does not authorize a repayment plan to provide for *cram down—i.e.*, nonpayment—of the portion of an unsecured claim that exceeds the value of the collateral. That "power" derives from Section 1325(a)(5)(B). *Rash*, 520 U.S. at 957. Accordingly, Section 1325(a)(5)(B)—not Section 506(a)(1)—"is the section [of the Bankruptcy Code] that authorizes cramdowns in Chapter 13 bankruptcies." *In re*

16

*Howard*, 597 F.3d 852, 854 (7th Cir. 2010) (Posner, J.).  That is why the Supreme Court

refers to Section 1325(a)(5)(B)—not Section 506(a)(1)—as "the cramdown provision,"

*Till v. SCS Credit Corp.*, 541 U.S. 465, 473 (2004), and that is why Section 1325(a)(5) is

a substantive, not just a procedural, provision.

Likewise, Section 1325(a)(5)(B) does indeed require that a confirmed plan set

forth a payment schedule for repaying the value of the secured component of an

undersecured claim.  But contrary to the dissenting opinion's reasoning, the Supreme

Court has recognized that the true "power" of Section 1325(a)(5)(B), *Rash*, 520 U.S. at

957, lies not in its requirement that the plan provide for payment of an allowed claim

over a defined period, but rather in that it allows "a debtor to strip a secured creditor's

lien down to the value of the collateral" and thereby "force a secured creditor to accept

*less than the full value of its claim*." *Nuvell Credit Corp. v. Westfall* (*In re Westfall*), 599

F.3d 498, 501 (6th Cir. 2010) (emphasis added).  Accordingly, Section 1322(c)(2)'s

express reference to Section 1325(a)(5)(B) provides strong evidence that Congress

intended to authorize not just modification of payment schedules—as the dissenting

opinion maintains—but also modification of claims, including through bifurcation and

cram down.

In sum, the plain language of Section 1322(c)(2) exempts from Section

1322(b)(2)'s anti-modification provision claims based on undersecured homestead

mortgages for which  "the last payment on the original payment schedule . . . is due

before the date on which the final payment under the plan is due," and therefore allows

bifurcation of such claims into secured and unsecured components.

17

B.

Because the plain language of Section 1322(c)(2) authorizes modification of homestead mortgage loans subject to that provision, we do not believe that it is proper to rely on legislative history to "muddy [the] clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also United States v. Hatcher*, 560 F.3d 222, 226 (4th Cir. 2009) (noting that a court may rely on a statute's legislative history "[o]nly if [the court] determine[s] that the terms of a statutory provision are ambiguous"). For the sake of argument, even if it was proper to look to the statute's legislative history, we do not believe that the legislative history carries much interpretive weight.

*Witt* points to two aspects of Section 1322(c)(2)'s legislative history as supporting its conclusion that that provision authorizes modification of payments, not claims—(1) that the legislative history nowhere states that Congress intended to overrule *Nobelman*, notwithstanding that construing Section 1322(c)(2) as allowing bifurcation and cram down would "overrule" *Nobelman*'s holding for the subset of homestead mortgages that mature before the end of a plan; and (2) that the legislative history is silent as to the modification of claims, notwithstanding that it expressly referenced a decision dealing with modification of payment schedules.

As to the first contention, it is correct that the statute's legislative history "makes no mention of the *Nobelman* decision or of any intention to overrule that decision" by enacting Section 1322(c)(2). *In re Witt*, 113 F.3d at 513 (noting that "[a]lthough the [House Committee] Report directly refers to forty cases, including three Supreme Court cases, that the Act was intended to overrule, *Nobleman* is not one of them"). According

18

to *Witt*, "[i]f Congress intended such a revolutionary change in the law, . . . it would have made clear its intention to do so." *Id.* (quoting *United States v. Langley*, 62 F.3d 602, 606 (4th Cir. 1995)) (alteration in original).

We believe *Witt* misplaced reliance on the absence of discussion of *Nobelman* in Section 1322(c)(2)'s legislative history. To begin, "silence in the legislative history, no matter how clanging, cannot defeat the better reading of the text and statutory context." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018) (citation and quotations omitted). "Even if Congress did not foresee all of the applications of [a] statute, that is no reason not to give the statutory text a fair reading." *Id.* Therefore, the absence of any discussion of *Nobelman* in Section 1322(c)(2)'s legislative history does not constitute a basis for rejecting the plain meaning of that provision, which, as explained above, authorizes the modification of claims, not just payments. *See supra* Part II.A.

More significantly, *Witt*'s interpretive reliance on the absence of any discussion of overruling *Nobelman* in Section 1322(c)(2)'s legislative history[4] rests on a faulty

---

[4] The thrust of the dissenting opinion's reasoning—that Congress failed to "enunciate[] with anything like the clarity required" that it "intended to totally overrule *Nobelman* by allowing debtors with short-term mortgages to modify the amount of those mortgages through stripdown and bifurcation"—also rests on the absence of any discussion of overruling *Nobelman* in Section 1322(c)(2)'s legislative history. *Post* at 38–39. Congress typically enunciates an intent to overrule a particular judicial opinion in a statute's legislative history. *See* James Buatti & Richard L. Hasen, *Conscious Congressional Overriding of the Supreme Court, Gridlock, & Partisan Politics*, 93 Texas L. Rev. *See Also* 263, 276 (2014) (finding that between 1985 and 2011 "unmentioned overrides" of judicial statutory construction decisions—overrides in which a statute's legislative history did not expressly indicate an intent to override a judicial construction (Continued)

premise—that Section 1322(c)(2), in fact, overruled *Nobelman*'s holding that "Section 1322(b)(2)[] prohibited a Chapter 13 debtor from bifurcating home mortgage debt." *In re Witt*, 113 F.3d at 509. But Section 1322(c)(2), as we construe it, does not overrule *Nobelman*.

*Nobelman* construed *Section 1322(b)(2)*, 508 U.S. at 325–26, 332, and that construction remains untouched and controlling by our interpretation of *Section 1322(c)(2)*. All that Section 1322(c)(2) does is exempt a narrow class of homestead mortgages—those mortgages for which the final payment is due prior to a debtor's last payment on a repayment plan—from Section 1322(b)(2)'s reach. *See In re Eubanks*, 219 B.R. at 477 ("*Nobelman* is not overruled by § 1322(c)(2)—it is still the law that a mortgage protected from modification by § 1322(b)(2) cannot be bifurcated. The 1994 enactment of § 1322(c)(2) changed the class of mortgages that are protected from modification by § 1322(b)(2) without overruling any aspect of the Supreme Court's holding in *Nobelman*."). Congress could not have intended to overrule *Nobelman* in enacting Section 1322(c)(2) because that provision is premised upon *Nobelman* remaining the controlling construction of Section 1322(b)(2). Put simply, there would be

of a federal statute—typically constituted less than 25% of total congressional overrides, and never exceeded 35% of total congressional overrides); William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions*, 101 Yale L.J. 331, 336–41 (1991). In accordance with that practice—and as *Witt* correctly pointed out—the legislative history for the bankruptcy statute that enacted Section 1322(c)(2) expressly identified numerous decisions Congress intended to overrule. 113 F.3d at 513. Thus, the "clarity" the dissent seeks would have been in the statute's legislative history. Simply put, the dissenting opinion follows *Witt*'s use of Section 1322(c)(2)'s legislative history to try to create ambiguity in the statute's plain language.

20

no need for Congress to exempt mortgages covered by Section 1322(c)(2) from Section 1322(b)(2)'s anti-modification requirement if Congress did not intend for *Nobelman* to continue to set forth the governing construction of Section 1322(b)(2). Because Section 1322(c)(2) does not "purport to overrule *Nobelman*, . . . it is no surprise that the legislative history does not say it does." *In re Mattson*, 210 B.R. at 160.

*Witt*'s and the dissenting opinion's reliance on the legislative history's express reference to an opinion dealing with modification of payment schedules, without mentioning modification of claims, is no more persuasive. It is true that the House Committee report stated that the enactment of Section 1322(c)(2) would "overrule the result in *First National Fidelity Corp. v. Perry*, 945 F.2d 61 (3d Cir. 1991), with respect to mortgages on which the last payment on the original payment schedule is due before the date on which the final payment under the plan is due." H.R. Rep. No. 103-835, at 52 (1994).

In *Perry*, a creditor obtained a foreclosure judgment following the borrower's home-mortgage default. 945 F.2d at 62, *superseded by statute*, Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106. Under relevant state and bankruptcy law, the borrower could "redeem his house by tendering the full amount due at any time . . . until sixty days after the order for relief." *Id.* at 65. Put differently, because the foreclosure judgment had been entered, the borrower's obligation under the loan accelerated, and, in order to keep his home, the borrower was obliged to make a single lump sum payment within sixty days. After entry of the foreclosure judgment, the borrower filed a Chapter 13 petition, which proposed paying the foreclosure judgment over the life of a multi-year

21

repayment plan, rather than within the sixty-day window. *Id.* at 62, 65. The Third Circuit held that in such circumstances payment spreading constituted an impermissible "modification" of the creditor's rights, in violation of Section 1322(b)(2). *Id.* at 65.

According to *Witt*, the Committee Report's reference to *Perry* indicates that Section "1322(c)(2) was *only* intended to allow payments to be stretched out over time; the debtor is still required to pay the 'full amount of the allowed secured claim.'" *In re Witt*, 113 F.3d at 512 (emphasis added). The dissenting opinion also points to the references to *Perry* in the Section 1322(c)(2)'s legislative history as evidence that Congress intended for that provision to authorize modification of the timing of payments, but not bifurcation and cram down of undersecured claims.

Again, "silence in the legislative history . . . cannot defeat the better reading of the text and statutory context." *Encino Motorcars*, 138 S. Ct. at 1143. Therefore, the legislative history's express reference to payment modification—and silence as to claim modification—does not provide grounds for ignoring Section 1322(c)(2)'s plain language, which authorizes claim modification, as well as payment modification. *See supra* Part II.A. Notably, the type of claim at issue in *Perry*—a single lump sum due and payable prior to the borrower's last payment on his proposed plan—is the type of homestead mortgage claim governed by Section 1322(c)(2). Accordingly, it makes sense that the legislative history expressly referenced *Perry* as it was a decision directly impacted by the enactment of Section 1322(c)(2). And just because Section 1322(c)(2)'s legislative history expressly references one form of claim modification—modifying a bargained-for payment schedule—that in no way precludes that provision from allowing

other forms of claim modification—including the bifurcation of an unsecured claim into secured and unsecured components, as Hurlbut seeks to do here.[5]

## III.

This Court does not overturn its settled precedents lightly. *Witt*, however, runs contrary to the plain text of Section 1322(c)(2), which authorizes modification of covered homestead mortgage claims, not just payments, including bifurcation of undersecured homestead mortgages into secured and unsecured components. Accordingly, with great respect for the *Witt* panel and the dissenting opinion, we hereby overrule *Witt*, reverse the district court's judgment relying on *Witt*, and remand this case to the district court for further proceedings not inconsistent with this opinion.

*REVERSED AND REMANDED*

---

[5] The dissenting opinion also hypothesizes numerous policy reasons to support its preferred construction of Section 1322(c)(2). For example, the dissenting opinion asserts that the majority opinion's construction "favor[s] debtors who happen to have fifty-nine months left on their home mortgage over those with sixty-one"; it might "lead to mischief in bankruptcy courts" because debtors will have "obvious incentives to delay filing" if doing so will allow them to exercise the cram down power; or it might "favor wealthy debtors over poor ones" because wealthy debtors ordinarily propose plans with longer payment terms. *Post* at 37–38. Not only does the record provide no basis to assess the merit of these policy assertions, neither does the statute or the legislative history of Section 1322(c)(2) provide any indication Congress considered, much less supported, these policy rationales. The judiciary's responsibility is to interpret statutes in a manner that gives effect to Congress's intent in enacting the statute. *See Miller v. French*, 530 U.S. 327, 337–38 (2000). What the judiciary lacks authority to do is "to substitute [its] view of policy for the legislation which has been passed by Congress." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52 (2008) (internal quotation marks and alterations omitted).

23

WILKINSON, Circuit Judge, with whom KEENAN and THACKER, Circuit Judges, join, dissenting:

Congress obviously has the last word on matters of statutory interpretation. It can overturn a Supreme Court decision interpreting an Act of Congress if it wants. The Supreme Court held in *Nobelman v. American Savings Bank* that 11 U.S.C. § 1322(b)(2) gives lenders broad protections from modifications of their homestead mortgage loans in bankruptcy. 508 U.S. 324 (1993). It is clear that, by enacting 11 U.S.C. § 1322(c)(2) after *Nobelman*, Congress limited the scope of that decision. My disagreement with the majority simply turns on how much.

Whereas the majority reads § 1322(c)(2) as completely overriding *Nobelman* with respect to an entire class of mortgages, I do not. When Congress exercises its power to override a major decision of the Supreme Court, it is appropriate to expect a modicum of clarity. Because I find that clarity lacking here, I am compelled to conclude that § 1322(c)(2) effected a more limited change to *Nobelman*, allowing debtors to repay their mortgages over the full duration of their plan. I thus respectfully dissent.

My dissent rests on a broader point than the particular bankruptcy provisions at issue, important as those provisions are. The majority has arrogated to itself the authority to overturn a Supreme Court decision in the absence of any clear desire by Congress to do so. This is not healthy. It is not the way our judicial system is supposed to work. See *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

I.

Chapter 13 of the Bankruptcy Code allows debtors to reorganize their debts and repay creditors from future income. To do so, debtors propose plans normally allocating their next three-to-five years of disposable income for confirmation by the court. See 11 U.S.C. §§ 1322(d), 1325(b)(4). Section 1322(b)(2) empowers debtors to propose a plan that will "modify the rights of holders of secured claims." There is an exception, however, for homestead mortgages, which are "claim[s] secured only by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1322(b)(2). That clause, the "anti-modification" provision, gives home mortgage lenders more protection than other secured lenders in bankruptcy.

The *Nobelman* decision interpreted the breadth of the anti-modification provision. That case, like the present one, involved an underwater mortgage where the debtors owed more money than their home was worth (in lending terms, the mortgage was "undersecured"). Debtors with undersecured mortgages may wish to modify the lender's contractual rights in any number of ways. Three are relevant here. First, a debtor may wish to extend how long he has to repay his mortgage, up to the length of the plan. While not changing the amount owed, this sort of change gives the debtor more time to make payments. Second, a debtor may wish to treat the portion of the mortgage that exceeds the value of the home separate from the remainder of the mortgage, which is called "bifurcation." See 11 U.S.C. 506(a). Third, a debtor may wish to reduce the value of the mortgage to the current value of the home, which is called "stripdown." See *In re Davis*, 716 F.3d 331, 338 (4th Cir. 2013) ("Section 506 has always operated in tandem with

25

section 1322(b) to strip liens . . . ."). Bifurcation and stripdown both allow a debtor to pay less than he otherwise would pay on the mortgage outside bankruptcy.

*Nobelman* interpreted § 1322(b)(2)'s anti-modification provision as prohibiting all three forms of modification for homestead mortgages. The Court first made clear that debtors cannot modify the *timing* of payments to these creditors, noting the lender's protected "right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest." 508 U.S. at 329; see *First Nat. Fidelity Corp. v. Perry*, 945 F.2d 61, 65-67 (3d Cir. 1991) (prohibiting repayment from extending over duration of plan). The Court next held that any modification with respect to the *amount* of the secured interest, whether by bifurcation or strip-down, was also barred by § 1322(b)(2). *Id.* at 324, 325-26. In this way, the anti-modification provision protected lenders from changes to the timing or amount of repayment in bankruptcy.

One year later, Congress passed and President Clinton signed the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106. The Act was not only a bipartisan effort to update the Code, but also uncontroversial—it passed both chambers of Congress by voice vote. The present case involves § 301 of the Act, entitled "Period for Curing Default Relating to Principal Residence." 108 Stat. at 4131. That section added Bankruptcy Code § 1322(c)(2), which provides:

> (c) Notwithstanding [§ 1322(b)(2)] and applicable nonbankruptcy law—
> . . .
> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

There can be no doubt that Congress meant for this new provision to limit the breadth of *Nobelman's* holding for "short-term" mortgages, where the final payment is due before the end of the plan. The majority and I agree that the new provision allows modification to the *timing* of payments on these mortgages. Our disagreement centers on whether § 1322(c)(2) also allows for modifications related to the *amount* that is secured by the home. Or, to speak more technically, the question is whether the provision allows the other two forms of modification that *Nobelman* prohibited: "bifurcation" and "stripdown."

My friends in the majority pretend that they are not overruling *Nobelman*. See Maj. Op. at 19-20 ("Section 1322(c)(2), as we construe it, does not overrule *Nobelman*."). This is not correct. The two holdings do not, under any conceivable view, treat short-term mortgages the same way. *Nobelman* says that a debtor like Mr. Hurlburt cannot "give effect to § 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan . . . ." 508 U.S. at 332. The majority says the opposite: Hurlburt can now give effect to the "bifurcation of undersecured homestead mortgages into secured and unsecured components." Maj. Op. at 23. The majority's whole quarrel with *Witt* is that *Witt* left *Nobelman* intact with respect to bifurcation and stripdown of short-term mortgages. See *In re Witt*, 113 F.3d 508 (1997). The majority claims that *Nobelman* remains controlling law in its interpretation of § 1322(b)(2), but that does nothing to refute the fact that its reading of § 1322(c)(2) completely upends *Nobelman's* anti-modification ruling as it pertains to a large and important class of mortgages. The fact that the majority chooses to

pretend that it is not overruling *Nobelman* need not lead anyone else to subscribe to its denial of the obvious.

As the majority is willing to read § 1322(c)(2) as overturning the *Nobelman* decision for an entire class of mortgages, it is appropriate to ask what sort of clarity we might expect from Congress before reaching that dramatic a result. As the *Witt* decision recognized, Congress often responds to decisions interpreting federal statutes. *In re Witt*, 113 F.3d at 513. See generally Matthew R. Christiansen & William N. Eskridge, Jr., *Congressional Overrides of Supreme Court Statutory Interpretation Decisions, 1967-2011*, 92 Tex. L. Rev. 1317 (2014). In doing so, Congress is often explicit, noting specific decisions in the statutory text or, by its terms, confronting a prior holding head on. See *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009). This sort of inter-branch interaction supports our longstanding presumption that Congress enacts new law with an eye towards existing interpretive decisions. See *United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995) (en banc) ("Congress is presumed to enact legislation . . . with the knowledge of the interpretation that courts have given to an existing statute.").

The Supreme Court has long acknowledged that this presumption has two features. First, it leads us to respect Congress's decision to override or endorse a particular holding; second, we do not lightly toss aside Supreme Court precedents that Congress has not squarely addressed. See *Smith v. City of Jackson*, 544 U.S. 228, 240-41 (2005) (rejecting argument that congressional disapproval of a holding with respect to one statute applied to its holding with respect to another). Taken together, the Supreme Court has set forth the presumption that when Congress means to override a recent, and highly

relevant, Court decision, it tells us so. The corollary is that we ought not infer such a departure when Congress has not clearly evinced a desire to do so.

This presumption has even greater force in contexts, like bankruptcy law, where Congress actively polices judicial interpretations of substantive statutes. See *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969) ("[The] significance [of congressional silence] is greatest when the area is one of traditional year-by-year supervision . . . where watchdog committees are considering and revising the statutory scheme."); see also Christiansen & Eskridge, *supra*, at 1361-62 (describing active congressional supervision over the bankruptcy code and related interpretive decisions). For that reason, the Supreme Court has made clear that courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (internal quotation marks omitted). That is not to say that Congress must use magic words or exhibit absolute clarity in order to overcome a Supreme Court decision interpreting the Code. Nor does it mean that every new law implicitly codifies any tangentially related decisions. What it does mean, however, is that Congress must exhibit some modest degree of clarity before lower courts can adopt a reading of a statute that would undermine a significant, on-point Supreme Court precedent.

II.

Applying this simple proposition, I share with my colleagues the view that Congress intended debtors to be able to modify the timing of their mortgage payments. But I do not believe that Congress intended to eviscerate *Nobelman* altogether, as the

29

majority would have it. It is instead my belief that a narrower reading of the statute, which would preserve a part of *Nobelman's* holding, is the superior one.

A.

It is clear that Congress meant for § 1322(c)(2) to create an exception to *Nobelman's* prohibition against modifying the *timing* of loan repayments. Section 1322(c)(2) is all about payment timing. The text of § 1322(c)(2) mentions "payments" four times, along with extended discussions of payment timing. See 11 U.S.C. § 1322(c)(2) ("[I]n a case in which the **last payment** on the **original payment schedule** for a claim secured only by a security interest in real property that is the debtor's principal residence is **due before the date** on which the **final payment** under the plan is **due**, the plan may provide for the **payment** of the claim as modified pursuant to section 1325(a)(5) of this title."). These words have significance. They serve as an indication that the section is about payment timing and scheduling, not about amounts.

The majority wishes to dismiss these references to payments as mere descriptors, arguing that many of those references to "payments" describe when a debtor will qualify for treatment under § 1322(c)(2). But these references also support the understanding advanced in this dissent. Congress limited § 1322(c)(2)'s application to debtors with short-term mortgages. Why limit the freedom to extend loan payments to debtors with short-term mortgages? Because debtors with long-term mortgages, where payment schedules already extend *beyond* the end of the plan, have no use for the right to extend payments *up to* the end of the plan. Paying a long-term mortgage over the duration of the plan would actually accelerate a long-term mortgage, which is the last thing the debtor

30

needs in bankruptcy. Indeed, § 1322(c)(2) allows missed payments ("defaults") to be repaid over the duration of the plan just like future payments. This puts the rights of debtors with short-term mortgages in sync with those of long-term mortgage holders, who can cure pre-existing defaults under § 1322(b)(5). See 11 U.S.C. § 1322(b)(5) ("[T]he plan may[,]— . . . (5) notwithstanding [§ 1322(b)(2)], provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.").

The relationship between § 1322(c)(2) and § 1325(a)(5), which it references, confirms this emphasis on payment timing. Just as the text of § 1322(c)(2) focuses on payments and timing, so too does § 1325(a)(5), which is a procedural section that outlines the conditions under which a court "shall confirm a plan." Subsections (5)(A) and (5)(C) provide that the court shall approve a plan if the secured claimholder consents to it or receives the secured property. Subsection (5)(B), the relevant one, allows a court to confirm a plan where, *inter alia*, the plan distributes "not less than the allowed amount" of the claim "in the form of periodic payments . . . in equal monthly amounts." § 1325(a)(5)(B). Where § 1322(c)(2) allows debtors to modify payment schedules, § 1325(a)(5) describes how exactly to do it. In other words, § 1322(c)(2) would allow a mortgage on which the final payment would be due in one year to be repaid over the full five years of the plan, even though such a schedule modification would formerly have run afoul of *Nobelman*.

31

Along those same lines, "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (internal quotation marks omitted); see *Yates v. United States*, 135 S. Ct. 1074, 1089-90 (2015) (Alito, J., concurring in judgment). The section heading relevant to the present case reads: "Period for Curing Default Relating to Principal Residence." 108 Stat. at 4131. What the text of § 1322(c)(2) makes clear, its section heading, which is equally part of the law, leaves no doubt: the provision empowers debtors to repay their mortgages over the length of the plan. Taken together, the text § 1322(c)(2) and the structure of the Code leave me with the conviction that Congress clearly intended to overturn *Nobelman's* holding on modifying payment timing.

### B.

To say that § 1322(c)(2) went beyond modification of payment *timing* to overturn *Nobelman's* holdings against modifying the *amount* of repayment, whether by bifurcation or stripdown, is a significant further step. Here, it is much less clear that Congress intended to act. There were various easy ways for Congress to do away entirely with the anti-modification protection for short-term loans. Congress could have specifically referenced bifurcation or stripdown in the text of § 1322(c)(2); it could have cited to 506(a), the bifurcation provision, just as it cited to § 1325(a)(5); it could have directly amended the anti-modification language in § 1322(b)(2) to not apply to short-term

32

mortgages[1]; or Congress could have provided in § 1322(c)(2) that § 1322(b)(2)'s anti-modification language "does not apply" to short-term homestead mortgages.

But Congress did none of those things. It instead used specific language: "notwithstanding subsection (b)(2)" the debtor can do one particular thing—namely, "provide for the payment of the claim" under the modified payment scheduling described in § 1325(a)(5). There is little reason to believe that Congress intended that narrow and specific language to open the door to the broad modification of mortgage loans in the manner the majority envisions.

The presumption in favor of respecting a Supreme Court decision is a strong one. Rather than honor that presumption, the majority chooses to go thrashing in the weeds. The majority advances several arguments in support of overturning *Nobelman* for short-term mortgages. None is persuasive. First, the majority argues that the phrase "'notwithstanding subsection (b)(2)' is a plain statement that subsection (b)(2)'s prohibition on the modification of loans secured only by an interest in a debtor's primary residence does not have any application to the class of claims that fall under § 1322(c)(2)." Maj. Op. at 14 (quoting *In re Paschen*, 296 F.3d 1203, 1207 (11th Cir. 2002) (internal alterations omitted)). This argument rests on the premise that allowing

---

[1] For example, § 1322(b)(2) could have been directly amended to add the following italicized language: the plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence *on which the last payment on the original payment schedule is due after the date on which the final payment under the plan is due* . . . ." This amendment would unquestionably have removed any barrier against modification of short-term mortgages imposed by *Nobelman* or § 1322(b)(2).

33

one type of modification to a short-term mortgage implicitly allows all forms of modification. But specific exceptions do not ordinarily render general rules meaningless. Section 1322(b)(5), for example, uses similar prefatory language: "notwithstanding paragraph (2) of this subsection [*i.e.* § 1322(b)(2)]," plans may modify long-term mortgages by curing defaults "within a reasonable time." No one has suggested that subsection (b)(5)'s prefatory language "is a plain statement" that the anti-modification provision "does not have any application to the class of claims that fall under § 1322[(b)(5)]." The same must be true of subsection (c)(2)'s prefatory language, which simply makes clear that subsection (c)(2) provides a specific exception to the general anti-modification provision.

The second argument pressed by the majority turns on the language, "the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5)." 11 U.S.C. § 1322(c)(2). As the majority sees it, the phrase "as modified pursuant to section 1325(a)(5)" modifies only the word "claim," rather than the complete phrase "payment of the claim." Maj. Op. at 13. To the majority, this matters because it suggests that § 1322(c)(2) must allow for any change to a "claim" that could possibly be approved under § 1325(a)(5). If, on the other hand, the reference to § 1325(a)(5) simply speaks to the "payment of the claim," it would align with the narrower reading, which reads (c)(2) as allowing changes only to payment timing. My colleagues in the majority, just like the Eleventh Circuit before them, rely on the so-called "rule of the last antecedent" to support the broader approach. Maj. Op. at 11-14; see, *e.g.*, *id.* at 13 (citing *In re Paschen*, 296 F.3d at 1208-09).

34

But that argument misapplies the rule of the last antecedent. First off, the rule ordinarily applies to lists. For example, in the phrase "cats, dogs, or gerbils that are brown," the "that are brown" limitation would only apply to gerbils. The language would thus encompass a white cat, just not a white gerbil. Without a list, § 1322(c)(2) falls outside the usual scope of the rule of the last antecedent. And under any circumstances, the rule does not require the mechanical reading of only the single word before the modifying provision. Instead, "[t]he rule [of the last antecedent] provides that a limiting clause or phrase should ordinarily be read as modifying only the noun *or phrase* that it immediately follows." *Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) (internal quotation marks and alterations omitted; emphasis added). The majority attempts to isolate one word—"claim"—which would be fine, of course, if that word were not integrally part of the phrase—"payment of the claim." Here, "as modified pursuant to section 1325(a)(5)" immediately follows the phrase "payment of the claim," so the rule of the last antecedent comfortably supports the reading that only payments (of the claim) can be modified. See 11 U.S.C. § 1322(c)(2).

Finally, the majority attempts to use the statutory reference to § 1325(a)(5) to bootstrap any form of modification that could conceivably be included in a Chapter 13 plan into the language of § 1322(c)(2). See Maj. Op. at 15-18. My colleagues' argument boils down to the contention that "[s]ection 1325(a)(5)(B) . . . allows 'a debtor to strip a secured creditor's lien down to the value of the collateral . . . .'" Maj. Op. at 17 (quoting *In re Westfall*, 599 F.3d 498, 501 (6th Cir. 2010)). But the stripdown power does not come from § 1325(a)(5). We have instead held that "section 506 has always operated in

35

tandem with section 1322(b) to strip liens . . . ." *In re Davis*, 716 F.3d at 338. Similarly, "[s]ection 506(a) is used in conjunction with § 1322 to allow . . . bifurcation[] of a secured creditor's claim . . . ." *In re Birmingham*, 846 F.3d 88, 93 (4th Cir. 2017). There is little reason to believe that, in referencing § 1325(a)(5), Congress actually meant to give debtors powers under § 506(a) and § 1322(b).

It is of course true that § 1325(a)(5), as an omnipresent procedural provision for all Chapter 13 plans, applies to plans that provide for bifurcation or stripdown. But it is equally true that § 1325(a)(5) can be applied without allowing a debtor to bifurcate or stripdown an undersecured claim. See *Tidewater Fin. Co. v. Kenney*, 531 F.3d 312, 315-21 (4th Cir. 2008) (applying § 1325(a)(5) to an undersecured car loan without allowing for bifurcation). Since the procedure in § 1325(a)(5) works with or without bifurcation and stripdown, § 1322(c)(2)'s clear emphasis on payments and timing counsel in favor of reading the reference to § 1325(a)(5) to allow debtors to take advantage of the payment scheduling provisions in that section rather than assuming, as does the majority, that debtors can also utilize powers from provisions found elsewhere in the Code.[2]

---

[2] The majority attempts to mash together separate procedural steps within the term "cram down." See Maj. Op. at 15-17. Obtaining relief under Chapter 13 of the bankruptcy code requires two important steps. First, "[t]he debtor shall file a plan," 11 U.S.C. § 1321, with the contents described in § 1322. Second, after a plan has been filed, "the court shall confirm a plan if" it satisfies conditions outlined in § 1325. Section 1325(a)(5)(B) provides that a court can approve a plan that involves "cram down," which occurs when a secured claim is bifurcated, repaid over the course of a plan, and eventually stripped down to the value of the secured property. See *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997). But before § 1325 comes into play, the debtor must first propose a plan that applies both bifurcation and stripdown to a secured (Continued)

36

C.

The majority would like to believe that its interpretation of § 1322(c)(2) is a "narrow" one. Maj. Op. at 3, 10, 20. But its interpretation applies to the huge class of short-term mortgages, and to mortgages that will inevitably become short-term mortgages as they near the end of their original payment schedule. This broad interpretation not only lacks clear support in the text, but will introduce new problems into the Code. For example, under the majority's view, a debtor whose final mortgage payment will be due on the fifty-ninth month of a sixty-month plan can keep his home by paying far less than he owes on the mortgage. But a debtor whose final payment will be due on the sixty-first month will be forced to repay every penny. Why favor debtors who happen to have fifty-nine months left on their home mortgage over those with sixty-one? The majority does not even attempt to provide an answer. There is no reason to think that Congress rested a matter of great consequence on something truly arbitrary. And once again, the distinction is perfectly understandable under the superior interpretation: § 1322(c)(2) allows timing modifications for only those short-term mortgages that would actually benefit from it.

---

claim. The authority to do so comes from elsewhere in the code. See *In re Birmingham*, 846 F.3d at 93 (bifurcation); *In re Davis*, 716 F.3d at 338 (stripdown).

The debtor in *Rash*, for instance, could propose a plan involving bifurcation and stripdown of a security interest in his truck under § 506(a) and § 1322(b) because the anti-modification holding in *Nobelman* plainly did not apply to trucks. With that plan properly proposed, the bankruptcy court could then confirm the plan if it satisfied § 1325(a)(5)(B). But this case involves a homestead mortgage, not a truck. *Nobelman's* anti-modification holding prohibits debtors with homestead mortgages, quite separately from § 1325(a)(5)(B), from proposing a plan that would bifurcate or stripdown those claims in the first place.

It is also easy to see how today's decision will lead to mischief in bankruptcy courts. Debtors have some measure of control over whether their mortgage will qualify as a short-term one. Debtors near the margins will have obvious incentives to delay filing for bankruptcy or stall proceedings until their final mortgage payment is less than sixty months away. That is, after all, the key to avoid paying the full amount owed on the mortgage under the majority's view.

Worse yet, these consequences will fall hardest on lower-income debtors. Plans proposed by lower-income debtors, by default, cannot last for more than three years. See 11 U.S.C. 1322(d). Wealthier debtors, on the other hand, ordinarily propose plans that last five years. See *id.*; 11 U.S.C. § 1325(b)(4)(A)(ii). Under the majority's interpretation, then, a low-income debtor with a four-year mortgage will ordinarily be required to pay every dollar he owes on that mortgage (because the final payment on the mortgage will be after the end of a three-year plan). Conversely, a high-income debtor with the same mortgage can pay less than the full amount (because the final mortgage payment will be before the end of a five-year plan). This is not to say that Congress cannot favor wealthy debtors over poor ones or rest matters of importance on arbitrary distinctions—it can— but the oddity of these results suggests that Congress did not intend § 1322(c)(2) to so thoroughly disrupt pre-existing bankruptcy law as interpreted by *Nobelman*.

Putting it all together, I am persuaded that Congress acted clearly in peeling back *Nobelman's* prohibition against modifying the timing of mortgage repayment. But I remain unconvinced that Congress also intended to totally overrule *Nobelman* by allowing debtors with short-term mortgages to modify the amount of those mortgages

38

through stripdown or bifurcation. When interpreting a bankruptcy provision in light of pre-existing precedent, that clarity makes all the difference.

The majority asserts that this dissent's position rests on "legislative history." Maj. Op. at 18-23. It somehow believes that by uttering the dread words "legislative history" it can inoculate itself from its refusal to consider evidence that fails to serve its purposes. See *Hamilton*, 560 U.S. at 517. Contrary to the majority's assertions, the dissent has nothing to do with legislative history. The inference to be drawn is not from the absence of some reference to *Nobelman* in a House or Senate Report; it is about the lack of modest clarity in the statute's own text.

To be sure, I think the interpretation of the text advanced in this dissent is the better one. But I do not rest upon that point; I rest instead upon the view that the majority's opposing interpretation of the statutory text has not been enunciated with anything like the clarity required to upset the *Nobelman* holding.

### III.

There can be no doubt that this is an issue of practical importance. The better interpretation of § 1322(c)(2) allows debtors to cure defaults and extend payments over the duration of a plan. In some cases, debtors will have several extra years to repay mortgages that they are currently unable to afford. This benefit is especially meaningful for debtors who face unusually large payments in the near future. One example includes debtors with balloon-payment mortgages, which require "a lump-sum payment of the outstanding balance" at some point in time. *Balloon-Payment Mortgage*, Black's Law Dictionary (10th ed. 2014).

Similarly, the great majority of mortgages have come to include acceleration clauses, which "require[] the debtor to pay off the balance sooner than the due date if some specified event occurs, such as failure to pay an installment . . . ." *Acceleration Clause*, Black's Law Dictionary (10th ed. 2014); see *Delebreau v. Bayview Loan Servicing, LLC*, 680 F.3d 412, 413-17 (4th Cir. 2012) (discussing acceleration clauses in home mortgages). Debtors in bankruptcy are uniquely vulnerable to acceleration clauses, as a single missed payment can sometimes cause the entire mortgage balance to become due. These sorts of mortgage instruments can push otherwise responsible borrowers toward bankruptcy because of one bounced check. The interpretation advanced herein empowers debtors with short-term mortgages to dig out from acceleration clauses and balloon payments over the course of the plan, just as Congress intended. For those homeowners, the opportunity to stretch payments over a 3-5 year plan, instead of paying every dime up front, can make all the difference. And in explicitly addressing the timing and scheduling of payments, § 1322(c)(2) alleviates a set of problems that borrowers all too commonly face.

Indeed, two years before *Nobelman*, the Third Circuit had already interpreted § 1322(b)(2) to prohibit a debtor from paying off a mortgage over the duration of his plan. *Perry*, 945 F.2d at 65-67. That very case was a subject of public discourse during the time period when the 1994 Bankruptcy Reform Act became law. See H.R. Rep. No. 103-835, at 52 (discussing *Perry*); S. Rep. No. 103-168, at 51 (same). Far from an empty reading, Congress' enactment of § 1322(c)(2) provided debtors with a concrete and

meaningful benefit that was unquestionably a matter of public discussion when the statutory language was added to the Bankruptcy Code.

That said, the majority's interpretation has the salutary effect of providing even more relief to debtors, many of whom have been hurt by unforeseen circumstances outside of their control. Home ownership lies at the heart of the American Dream. No one wishes to snatch it just as people have begun to realize it. The ability to stay in your home by reducing how much you have to pay on your mortgage is a big deal for bankrupt homeowners. In this case, for example, Mr. Hurlbut may be able to use bifurcation to avoid foreclosure by giving Ms. Black payments worth only $41,132.19, instead of the $180,971.72 that under the loan documents he currently owes. That change likely represents the difference between keeping his home in bankruptcy, or not.

These undoubted benefits, however, come at a cost. Lenders are not blind to the effects of bankruptcy, and when the Code allows debtors to pay less than they owe in bankruptcy, lenders adjust accordingly. One empirical study has suggested that the *Nobelman* decision, which protected mortgage loans from modification, resulted in a three percent reduction in interest rates and a one percent increase in mortgage approval rates. See Wenli Li et al., *Using Bankruptcy to Reduce Foreclosures: Does Strip-Down of Mortgages Affect the Supply of Mortgage Credit?*, at 14 (Nat'l Bureau of Econ. Research, Working Paper No. w19952, 2014). Our prior decision in *Witt* accordingly protected potential borrowers from more expensive and restrictive lending practices, in line with the purpose of the anti-modification clause in the first place: "to encourage the flow of capital into the home lending market." *Nobelman*, 508 U.S. at 332 (Stevens, J.,

41

concurring). Extending new forms of relief to debtors, as does the majority, may make it more difficult and costlier to secure a home mortgage, especially for young and hardworking families trying to experience the joys (and headaches) of home ownership for the first time. Loan officers are acutely sensitive to risk, and those confronted with the prospect of bifurcation and stripdown of the amounts owed under mortgage contracts will inevitably tilt loan approvals to more affluent (and less risky) applicants. Home ownership is the very essence of opportunity in this country, and this decision may result in less of it.

Ultimately, these trade-offs between protecting those in bankruptcy and encouraging a free-flow of capital for potential homeowners bottom out on a policy debate. I venture into this terrain only to show that, in light of unclear language, there are valid policy considerations on both sides. It is ultimately Congress's province to strike the "delicate balance" between the various interests in bankruptcy. *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1415 (2017) (internal quotation marks omitted). Bankruptcy is a field rife with unintended consequences when that "delicate balance" is disturbed.

We know how Congress struck that balance under the Code as interpreted by *Nobelman*. In areas with established precedent, we should respect the existing balance when Congress does not clearly wish to alter it. This does not mean that Congress must be crystal clear. Such a requirement would diminish the legislature's ability to reach compromises: Congress is a body with many members, and a little fuzziness may be necessary to come to an agreement. But that need does not obviate the presumption that

Congress must speak with some modest clarity when nullifying on-point statutory Supreme Court precedents, particularly those in fields where Congress has its ear to the ground and casts an active eye. See *Hamilton*, 560 U.S. at 517.

The statutory text here supports a straightforward conclusion. Congress crafted a compromise that allowed debtors the time and space to get back on their feet without writing down debt to an extent that will restrict the flow of capital to prospective homebuyers. The majority runs far out in front of the statutory language. It charges forward without a note of caution and without a hint of doubt. The most basic task of judging is to understand when certitude is warranted and when certitude is perilous. The majority and I answer that question very differently today.

In recognition of Congress's clarity and its undoubted supremacy in matters of statutory interpretation, I agree that *Nobelman's* disallowance of modification as to the timing of loan repayments can no longer stand. In recognition of the absence of that same clarity in the face of obvious Supreme Court precedent, I believe that *Nobelman's* reading of § 1322(b)(2) to prohibit bifurcation and stripdown remains good law. Overruling a Supreme Court decision *in toto* on the basis of what is, at best, an ambiguous congressional expression is not a course I am prepared to take. For the above reasons, I respectfully dissent.

43